[Civil No. 2257.  Filed May 22, 1926.]

[236 Pac. 694.]

SELIM M. FRANKLIN, Executor of the Last Will
of LIONEL M. JACOBS, Deceased, ABRAHAM
M. FRANKLIN, HILDA HOROWITZ, VIC-
TORIA CALISHER, VICTORIA KATZ, LIO-
NEL M. JACOBS, Jr., JULIA HANNAH
COHEN, and SELIM M. FRANKLIN, Person-
ally, Appellants, v. BERTHA FRANK JACOBS,
Appellee.

1. WILLS — CODICILS ARE PART OF WILL AS MATTER OF LAW. — As
matter of law, the codicils are as much the will as the instrument
which they are intended to change, explain, modify, or add to.

2. WILLS — WILL AND CODICILS CONSIDERED TOGETHER AS WHOLE IN
DETERMINING TESTATOR'S INTENTION.—A will and its codicils must
be considered together as a whole to determine testator's intention,
and, if intention is not discoverable therefrom, sanctioned rules of
construction may be resorted to, in ascertaining such intention.

3. WILLS—INTENT OF TESTATOR ALL-IMPORTANT.—Testator's intention
is all-important thing in construing will.

4. WILLS—AMBIGUOUS CODICIL HELD NOT TO HAVE REVOKED PRIOR UN-
AMBIGUOUS DEVISE IN MAIN WILL. — Will and codicils construed
together, and *held*, that testator did not, by an ambiguous clause
in one of such codicils, intend to revoke *in toto* an unambiguous
devise in will of one-half of residue of his estate to his nephew
and nieces, and devise entire residue to his widow.

5. WILLS — UNAMBIGUOUS DEVISE IN WILL NOT DEFEATED BY AM-
BIGUOUS CODICIL UNLESS TESTATOR'S INTENTION CLEAR. — An
ambiguous codicil will not be allowed to vary or modify an un-
ambiguous devise in will, unless such is plain intention of tes-
tator.

1.  See 28 R. C. L. 197.
2.  Construction *together* of will and codicil, see notes in 28
Am. St. Rep. 353; 18 Ann. Cas. 284; 8 L. R. A. 742. See, also,
28 R. C. L. 199.
3.  See 28 R. C. L. 211.
5.  Modification of will by codicil, see note in 1 L. R. A. (N. S.)
397.

**6. WILLS—TESTATOR'S CLEARLY EXPRESSED INTENT PRESUMED TO CONTINUE, UNLESS DIFFERENT INTENT SUBSEQUENTLY EXPRESSED IN UNEQUIVOCAL LANGUAGE.**—When testator has once spoken his intention in unmistakable terms, it will be presumed that such intention continues, unless subsequently, either directly or by implication, he expresses different intention in unequivocal language, so as to leave no doubt that he has changed his mind.

See (1) 40 **Cyc.**, p. 994.  (2) 40 **Cyc.**, pp. 1421, 1423 (1926 Anno.).  (3) 40 **Cyc.**, p. 1386.  (4) 40 **Cyc.**, p. 1183.  (5) 40 **Cyc.**, p. 1179.  (6) 40 **Cyc.**, p. 1179.

APPEAL from a judgment of the Superior Court of the County of Pima.  George R. Darnell, Judge.  Judgment reversed and cause remanded.

Mr. Gerald Jones and Mr. Selim M. Franklin, for Appellant Selim M. Franklin; Mr. Selim M. Franklin, *in propria persona.*

Mr. John B. Wright, for Appellants Abraham M. Franklin, Hilda Horowitz, Victoria Calisher, Victoria Katz, Lionel M. Jacobs, Jr., and Julia Hannah Cohen.

Messrs. Kingan, Campbell & Conner, for Appellee.

ROSS, J.—This case involves the construction of the last will and testament of Lionel M. Jacobs, deceased, and comes here on exceptions to the order of distribution.  The contest is between seven nephews and nieces of the deceased on the one hand and the widow on the other.  Two executors were named in the will (Bertha Frank Jacobs and Selim M. Franklin)—one a resident of California, and the other of Tucson, this state.  The local executor, who had active charge of the estate, construed the will as devising and bequeathing one-half of the residuary estate to the widow and one-half thereof to said nephews and nieces, share and share alike, and asked that the same be distributed, after certain specific legacies

were cared for, accordingly. The widow filed exceptions to the petition and therein contended that the will and codicils when construed together bequeathed and devised the whole of the residuum to her. Upon the hearing the petition was approved in all respects except the claim of the seven nephews and nieces to one-half of the residuary estate. The court construed the will as giving to the widow, after the deduction of the specific legacies, the whole of the estate. Whether the court was right in its decision is the question.

The appellee (widow) married the deceased on June 15, 1909, at which time he was 67 and she was 38 years old. He died February 8, 1922, possessed of an estate of over $240,000, all his separate property. He was a man of wide experience, good education, careful and cautious in business, and he held in high esteem and affection the appellants, and in fact all his relations. This is apparent from his will and the codicils, and also from the testimony in the record. This was true when he made his will on April 15, 1914, and continued up to the time of his death. He had lived, before his marriage to appellee, in the family of some of the appellants when they were youngsters, and had helped them or some of them in financial ways, and after his marriage the happy and cordial friendship and relation that had theretofore existed was not dampened or abated. His married life appears to have been a happy one, of mutual fidelity and of devotion between him and the appellee. He made changes and modifications in some of the bequests and devises of his will in the codicils, but not through any estrangement between him and beneficiaries, but through other considerations which he explained in each case. So we have a man of sound mind and good understanding making his will, in which he bestows his bounties upon his wife, these seven nephews and nieces, and some other blood relations, to whom at

the time and always he was sacredly devoted and for whose welfare and care he was solicitously interested, as a background to what he did or intended to do when he made his will and subsequently the codicils thereto.

By the will, dated April 15, 1914, he devised to appellee four lots in the city of Tucson, also 70 shares of the capital stock of the First Mortgage Company, of El Paso, Texas, and 52 shares of the capital stock of the Arizona National Bank, of Tucson, Arizona,— all valued at about $60,000. He directed that 74 shares of the capital stock of the Rio Grande Valley Bank & Trust Company, of El Paso, Texas, and 20 shares of the capital stock of the First National Bank, of El Paso, Texas, be set aside out of his estate, and that the interest thereon, amounting to $1,208, be paid monthly—to his sister Priscilla Jacobs $50, to his sister Amelia Euphrat, $25, to his brother Victor Israel Jacobs $29, during their natural lives— and that thereafter such stock be distributed and divided equally among his nieces Lotta J. Minaker, Matilda Euphrat Cameron, and Grace Eleanor Horowitz. Then follows this language:

"Of all the rest and residue of my estate, real and personal after the devises and bequests hereinabove recited are carried out and my just debts paid, I hereby devise and bequeath one-half interest thereof to my wife, Bertha Frank Jacobs, and the remaining one-half, equally share and share alike to the following named nephews, nieces and grandnieces, if living, and if dead to their lawful heirs, A. M. Franklin, Hilda Horowitz, Victoria Katz, Victoria Calisher, Lionel M. Jacobs, Jr., S. M. Franklin and Julia Hannah Cohen."

Attached to the will was a list of properties under this heading: "Schedule of property real and personal additional to that devised, bequeathed and disposed of specifically by terms of accompanying will."

This property consisted of real estate in Arizona and elsewhere, notes and mortgages and stocks, and cattle in charge of Bernabe Robles.

The first codicil was written in London, England, one month after the date of the will, and was in confirmation of a deed of trust to certain real property in San Francisco that he had made, naming Lotta Jacobs Minaker as the beneficiary, and providing for the devolution of the property in the event of her death. As there is nothing in this codicil affecting the terms of the will, it is not necessary to consider it.

The second codicil was made June 17, 1916, at the testator's house in Tucson, and recites that, whereas the testator desires to modify or add to his will certain matters and things, he declares it to be a codicil thereto, and directs that it be annexed to the will and taken as a part thereof. In this codicil he notes:

(1) That his brother Victor had died, and the will to that extent had been revoked.

(2) That his sister Amelia Euphrat fortunately did not require any assistance from him, and he accordingly revoked the provision in the will for her benefit.

(3) As a mark of affection for this sister he bequeathed her $1,000, to be paid out of his estate.

(4) And this is the bone of contention, he states:

"I hereby declare that I hereby bequeath and devise unto my beloved wife, Bertha Frank Jacobs, all the real and personal property, including the cattle owned by me and in charge of Bernabe Robles which real and personal property has not heretofore been otherwise bequeathed and devised."

(5) He declares that he has not made any bequest to his brothers and sisters not named in the will nor any codicil because they are fortunately amply provided for and require no assistance.

(6) In recognition of the unswerving fidelity of his lifelong friend, Bernabe Robles, of Tucson, he gave him his gold watch and chain.

The third codicil was made in San Francisco on the eleventh day of February, 1919, and by it he gave, bequeathed, and devised to the appellee all promissory notes and other obligations secured by mortgage, trust deed, or other liens, upon real property in the state of Texas, and empowered her to satisfy of record all such liens and mortgages when they were paid.

The fourth codicil is also dated at San Francisco April 10, 1920, and by it he directed his executors (1) to pay all taxes on trust property, described in the first codicil, for ten years after his death; (2) to pay to his sister, Priscilla Jacobs, $100 a month in lieu of any other provision; (3) he provided for a substitute executor in the event one of those named by him should not be able or willing to act; (4) he directed that his interest of $2,500 in a trust loan of $8,000, made by him through the Texas Bank & Trust Company, of El Paso, be continued to be invested for the benefit of Hortense Jacobs, daughter of his nephew and namesake Lionel M. Jacobs, Jr.; (5) he bequeathed a lot in the city of San Bernardino, California, to his nephew and namesake Lionel M. Jacobs, Jr., in trust for the benefit of his wife and child or children; (6) he bequeathed to his grandnieces Dorothy, Elizabeth, Marjorie, Gladys, and Mary Franklin, of Tucson, and Eleanor Parsons, of San Bernardino, each a $1,000 Liberty bond; (7) he recommends that certain Texas investments be continued; and (8) he states:

"I declare that I have not named any relatives but those of the whole blood as being entitled to benefit from the provisions of my last will and I have not named any brother or sister or their issue who fortunately are so situated as to not require mention. . . . "

The will and all the codicils were in the handwriting of the decedent.

When we speak of the will we mean the instrument by which the testator first disposed of his property—not that it is the sole depository of the testator's intention, but for convenience and in contradistinction to the codicils. As a matter of law, the codicils are as much the will as the instrument they are intended to change, explain, modify, or add to. All these must be considered together as a whole, and, if after such consideration the intention of the testator is discovered, it must be declared. If the intention is not discoverable from the language of the testator when construed all together, then permissible and helpful rules of construction, rules sanctioned and approved in like circumstances, may be resorted to as an aid in ascertaining such intention. It is trite to say that the intention of the testator is the all-important thing. Many of the text-writers and decisions speak of it as the "pole-star." To ascribe to the testator any other intention than his as expressed in his will would be the substitution of a court-made will for his own.

The terms of the present will, it will be seen, are not at all in doubt. The intention of the testator as therein set out is plainly and easily discernible. He gave certain described and named property to the appellee, a brother, two sisters, and three nieces, and the residuum he gave one-half to appellee and the other half to appellants. There is no ambiguity here; no difficulty in discovering the intention of the testator, for he has expressed himself in such a plain straightforward way and in such a direct manner as that no one could well mistake his meaning, and, had he died while it remained so, no division of opinion could possibly have arisen as to who were the residuary legatees.

Twenty-six months after making the will, the testator, for reasons which he suggests, writes a codicil "to modify or add to said will the certain matters

28 Ariz.—13

and things as hereinafter set forth.'' In effect he says, because of the death of his brother, Victor, the bequest to him had reverted to testator's estate, and his sister, Amelia Euphrat, not needing his assistance the bequest to her is revoked, and in lieu thereof, and as a mark of affection, he bequeaths her $1,000. He recalls his lifelong friend, Robles, and leaves him his gold watch and chain. He gives, as the reason for not leaving something to any of his brothers or sisters not named in his will or any codicil, that they were amply provided for and did not require his assistance. The bequest to his sister, Priscilla, and his nieces, Lotta J. Minaker, Matilda Euphrat Cameron, and Grace Eleanor Horowitz, were left unchanged. Thus far he had added one legatee (Robles); he had modified the bequest to his sister, Amelia Euphrat, and noticed his brother Victor's death. The question is, What did he do or intend to do by the fourth clause? On the one hand it is claimed by appellee that the fourth clause of this (second) codicil modified the residuary clause of the will to the extent of excluding the appellants from any of its benefits, whereas the appellants contend that such paragraph is a confirmation of the bequest to them in the residuary clause, except perhaps as to the cattle. To sustain her contention, the appellee would insert in said clause the word ''specifically,'' making it read as follows:

''I hereby declare that I hereby bequeath and devise unto my beloved wife, Bertha Frank Jacobs, all the real and personal property, including the cattle owned by me and in charge of Bernabe Robles which real and personal property has not heretofore been otherwise specifically bequeathed and devised.''

Appellee justifies such construction on the ground that any other construction would rob the testator's language of any meaning whatever. If he intended by this language, it is said, to give to appellee all

such property as had not theretofore been bequeathed or devised, he gave her nothing by its use, that it had nothing to operate on unless it reached the residuary estate, and that the intention being clear that it did reach a portion of the residuary estate, to wit, the cattle, it is equally clear that it gave to appellee all of the residuum. It is also contended that it was the intention of the testator to give all of the residuum to appellee, and that such intention is manifest from the use by the testator of language describing and distinguishing such residuum from specific gifts in the list of the property making up the residuary estate attached to the will. Such property is described as "property real and personal additional to that devised, bequeathed and disposed of specifically by terms of accompanying will." If the testator regarded his estate in two aspects, for the purpose of disposing of it to his relatives, and employed the word "specific," or its derivative, as descriptive of those bequests in which he described the particular property or sum given in contradistinction of the residue, it would not be too much to assume that he would have used it in describing what he meant to give appellee and would not have left it to the court to supply the word by way of construction. Knowing the meaning of the word "specifically" as he had employed it in the list of the property in the residuary estate, he omitted to use it in clause 4, either because it would not convey his intention, or on purpose, or by inadvertence. We cannot bring ourselves to think we should do what the testator refused or neglected to do and supply a word that would make what is ambiguous unambiguous in a codicil, and thereby entirely defeat bequests clearly and explicitly made under the will.

However, should the word "specifically" be supplied, and the bequest to appellee under clause 4 be regarded as "all real and personal property not

heretofore specifically bequeathed and devised," that would not of necessity end the ambiguity in the codicil. The interesting question as to what is a specific bequest would arise, and whether all the bequests, except the $1,000 to Amelia Euphrat and $100 per month to Priscilla Jacobs were specific, the latter two being general. 40 Cyc. 995; 28 R. C. L. 289, §§ 263–265; *Rice* v. *Rice* (Iowa), 119 N. W. 714; *Wilts* v. *Wilts,* 151 Iowa, 149, 130 N. W. 906; *Nusly* v. *Curtiss,* 36 Colo. 464, 118 Am. St. Rep. 113, 10 Ann. Cas. 1134, 7 L. R. A. (N. S.) 592, 85 Pac. 846.

The construction contended for by appellee, appellants assert, would be the making of a will for the testator and a disposition of his property by the court and not by himself. Appellants, or some of them, would phrase this clause (4) thus:

"I hereby bequeath and devise unto my beloved wife, Bertha Frank Jacobs, my cattle and all the real and personal property not heretofore bequeathed and devised."

These opposing views of how this clause should be construed are good evidence that the testator's intention as therein expressed is obscure and ambiguous. If the peculiar language of the testator is literally construed, it would operate on none of the residuum except a one-half interest in the cattle, since one-half thereof had theretofore been bequeathed to the appellants. In other words, the testator had disposed of his estate, including cattle, in his will, and in this provision of the codicil he confirms such disposition, changing only the gift of the cattle. He was, however, a man of business and experience, and, as these instruments indicate, had some familiarity with the law of wills, and, that being so, the question arises, Why did he not, if he wanted only to enlarge his bequest to appellee by giving her all the cattle instead of one-half of them, simply say so? He could

have said, "I hereby bequeath to my beloved wife all of my cattle" or "all of my cattle in the care of Bernabe Robles," and it would have left no doubt as to his intention to revoke the bequest *pro tanto* to the appellants. But he did not say that; he said that much and more, and he said it in such a way, standing alone or when looked at in connection with what he said in the will, that it seems impossible for one to divine his intention. And, if this language should find no explanation in subsequent acts and codicils of the testator, we would be compelled, under the rule laid down by the decisions to the effect that, if the will clearly, certainly, and unambiguously devises and bequeaths property, such bequest will not be defeated by obscure and ambiguous language of a codicil. Two or three citations will suffice for the law on this question of construing unambiguous wills and ambiguous codicils together. Schouler on Wills, 6th ed., vol. 2, § 904, says:

"The codicil should be construed with the will itself; and from its very nature may, as a context, confirm, alter, or altogether revoke an intention expressed in the body of the instrument to which it is annexed. A will and codicil are to be construed as one instrument, and are to be reconciled if possible, . . . and a will and codicil appended thereto and containing no words of revocation are to be considered as a single instrument. . . . Yet even here a codicil should be so construed as only to interfere with the disposition made in the will to the extent needful for giving full effect to the codicil, and a gift clearly expressed in a will should not be cut down by ambiguous expressions in the codicil."

In *Quincy* v. *Rogers,* 9 Cush. (Mass.) 295, it is said:

"Though, if the codicil stood alone, its language might seem to require one construction, yet, if the effect of such construction is to revoke a clear grant made by the will, the court will not give it that construction, unless the words of revocation by the codicil

are equally clear with the language of the grant in the will.''

In 28 R. C. L. 200, § 157, it is said:

''The testator's purpose in making the codicil may be found in the codicil itself, and, in construing a will and codicil, a disposition made by the will is not to be disturbed further than absolutely necessary to give effect to the codicil. A codicil will not be allowed to vary or modify the will, unless such is the plain intent of the testator. A revocation by a codicil of a gift in the will extends only so far as the will is inconsistent with the codicil, and a gift once made by the will is not to be cut down by a subsequent codicil unless the intention of the testator to that effect appears clearly or by necessary implication.''

We will for the moment, for the purpose of illustration, adopt the contention of the appellants that the second codicil at most removed from the residuary estate the cattle and left the bequests of the will to them otherwise untouched. The cattle were subsequently sold for $35,000. If this be added to the specific bequests in the will to appellee, his sisters, Priscilla Jacobs and Amelia Euphrat, the nieces Lotta J. Minaker, Matilda Euphrat Cameron, and Grace Eleanor Horowitz, it would come to about $100,000, and leave a residuum of about $140,000. These figures are estimates and are used only to show approximately what was left in the estate when on February 11, 1919, the testator made his third codicil wherein he bequeathed to appellee certain notes, mortgages, and liens, against property and persons in Texas, amounting to about $42,000. In doing this, if the appellants as legatees were entitled to one-half of the residuum after the execution of the second codicil, the testator, if not in express terms, then by implication, modified, or changed the bequests to appellants by taking therefrom one-half of $42,000, and giving it to appellee. This is admitted, and it is said the reason for this modification

was that the testator desired to avoid administration in Texas and the expense attendant thereon, and, having learned through legal advice that, if the property in Texas were devised to appellee and an exemplified copy of the will filed in the county clerk's office of the proper county, a release of mortgage or vendor's lien by her as such devisee would be good, and thereby administration in Texas avoided, he made the third codicil.

On the one hand it is said that, if the fourth clause of the second codicil wiped out the residuary estate by giving it all to the wife, why the third codicil, since it gave her nothing she did not already have? It is said the fact of the testator's making the third codicil, by which he gave the appellee certain of his Texas property, is strong evidence that it had never occurred to him that he had given it to her by the will or any previous codicil. This is answered by the argument that the testator knew he had given to appellee all his real and personal property not theretofore specifically devised and bequeathed, and that he made the third codicil at the instance of the local executor and for the purpose only of avoiding administration in Texas.

The record shows the local executor did, at the request of the testator, investigate the law, and, after consulting a Texas firm of lawyers, advised the testator how he might avoid the administration of his estate in Texas, but it does not appear that such executor knew of the terms of the will or previous codicils, or that anybody but the testator knew how or to whom he had devised or bequeathed his property.

It would seem that, if he had intended by the working of the fourth clause of the second codicil to take away from appellants what he had given them under the will, and to give it to appellee, he would have, when advised that a devise to her of the Texas

property would avoid administration, rested upon such revocation and disposition, instead of making a codicil to do what it is contended he had already done. The testator knew his own mind and intention better than anyone. Even though he used ambiguous language, he knew what he intended; it was not ambiguous to him. He either intended by its use to give the whole of the residue to appellee, or he did not intend to do so. If he knew he had given her all, why the trouble, let alone the possible confusion, of giving it to her again in piecemeal? He must have known or felt that an exemplified copy of the will and the first and second codicils would not show to the interested parties in Texas that he had devised and bequeathed the property belonging to him therein to appellee, and hence the third codicil. In addition to taking from the residuum the cattle and the Texas property, during the year 1919 the testator undertook to give to appellee certain certificates of stock and three Liberty bonds of $1,000 each, all amounting to about $43,000, by placing same in envelopes and writing thereon this legend:

"Property of Lionel M. Jacobs and/or Bertha Frank Jacobs and in the event of the death of either then the property of the other."

These envelopes were deposited in the testator's safe-deposit box in the Arizona National Bank of Tucson. This attempted gift the court held was ineffective because of lack of delivery; the appellee not having been given a key to the safe-deposit box nor any control over it or its contents during the life of donor. These certificates and bonds therefore remained a part of the residuum. It shows, however, that, even though the testator did bequeath and devise in his will one-half of the residuum to appellants, he felt at perfect liberty to hew it down at any time in order to increase the portion or share of his wife. But that he might be desirous of increasing his

bounties to his wife by whittling down the gifts to appellants is not conclusive, if any evidence, that he intended to take away from appellants everything he had given them under his will.

This brings us to the fourth and last codicil, dated April 10, 1920, or one year and eleven months before the decedent's death. When this codicil was written the bequests under the will to the appellants had not, as we conclude, been revoked *in toto,* but only reduced by what was taken therefrom and given to appellee in the second and third codicils. In the fourth codicil the residuum is further reduced or modified by gift to his grandniece, Hortense Jacobs, of $2,500; of a lot in San Bernardino to his nephew and namesake, Lionel M. Jacobs, Jr., in trust for the benefit of his wife and child or children; to his grandnieces, Dorothy, Elizabeth, Marjorie, Gladys and Mary Franklin, and Eleanor Parsons, each a $1,000 Liberty bond; in changing the bequest to his sister, Priscilla, to a monthly allowance of $100 during her life; and in providing that his estate pay the taxes on the San Francisco trust property for ten years after his death. These are the only material changes made by the fourth codicil, unless the eighth clause therein be construed as evidencing an intention to exclude from the benefits of his will most everybody he had named as a legatee, which clause is in the following language:

"I declare that I have not named any relatives but those of the whole blood as being entitled to benefit from the provisions of my last will and I have not named any brother or sister or their issue who fortunately are so situated as to not require mention. . . . "

Looking back to his will and down through his codicils, we find that the testator started out remembering by bequests three relatives of the whole blood (two sisters and one brother). One of these having

died in the meantime (the brother), at the end he gave to one sister $1,000 and to the other a monthly allowance during her life. None of the other legatees were of the whole blood relation to the testator—not even his wife, the appellee. So, if the benefits of the will are limited to the named relatives of the whole blood, the testator has disposed of but a small part of his estate. It is clear that his intention would be defeated if his language in this clause be construed according to its legal import. What he meant to say and did say in clause 8 was that he had ''not named any brother or sister or their issue who fortunately are so situated as not to require mention.'' In the fifth clause of the second codicil he stated that he had made no bequests to any of his brothers or sisters not named in his will or any codicil; because those not named were fortunately well provided for and did not require his assistance. In clause 8 of the fourth codicil he excludes from the benefits of his will the issue of any unnamed brother or sister. At the time of making the last codicil, the testator, besides the two sisters named in the will and codicils, had one living brother, Barron M. Jacobs, of Tucson. Neither this brother nor any of his issue had been named by decedent in the will or in the codicils, and it was the evident purpose of the testator that they should receive nothing. It could not have been his purpose by this general statement to revoke bequests expressly made in the will or any codicil to named nephews and nieces or grandnieces, for, besides the seven named residuary legatees in the will, he had bestowed gifts upon other nieces and nephews and grandnieces.

We are satisfied that the testator used no language in codicils 3 or 4 indicating an intention to revoke *in toto* the bequests he had made appellants in his will, but instead revoked such bequests in part only. And because of the impossibility of determining his

meaning by the language he used in clause 4 of the second codicil we must fall back upon the rule of construction that a codicil will not be allowed to vary or modify the will, unless such is the plain intention of the testator. If this results in defeating the will and intention of the testator, it is because he failed to express his wishes with sufficient clearness, so that such changes could be determined without the aid of an arbitrary rule of construction. This rule has been adopted by the courts because, when the testator has once spoken his intention in unmistakable terms in his will, it will be presumed that such intention continues, unless he subsequently, either directly or by implication, expresses a different intention in unambiguous or unequivocal language, and in such way as to leave no doubt that he has changed his mind. If he has not made it clear by his subsequent language and all the circumstances that he has revoked a gift of the will, and has left the matter in doubt, this rule of construction may not always find the "pole-star," but it will more nearly approximate it than any other known rule.

While this conclusion is impelled by the law, it seems to us compatible with the facts. The testator, out of his love and affection for the seven residuary legatees, bestowed upon them quite bountifully in his will, when it was written in 1914, and, if appellee's contentions are valid, in 1916 he withdrew this manifestation of love and affection for them *in toto,* notwithstanding no change had taken place in their relations nor in his financial ability. Up to the time of his death he entertained the same affectionate regard for appellants. If it was his affection that prompted the gift in the first place, and that affection was never withdrawn, why should the gift be entirely withdrawn? He might reduce the gift, as he did; but did he withdraw every material manifestation of affection? On the other hand, he had amply pro-

vided for appellee. The bequest to her, clearly expressed, is approximately $140,000, and in addition to that one-half of the residuum. It is evident that he intended the bosom companion of his declining years should have the bulk of his fortune, and that she receives. But it is not clear that he did not also intend that appellants continue as his residuary legatees.

We conclude that the judgment of the lower court should be reversed, and the cause remanded, and that such proceedings be taken as are in accord with this opinion; and it is accordingly so ordered.

McALISTER, C. J., and LOCKWOOD, J., concur.